UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHEN EICHELKRAUT, | |
| Plaintiff, | No. 21 C 02528 |
| v. | Judge Thomas M. Durkin |
| Grundy County Correctional Officers KILEY JUNGLES; MICHAEL WEITZEL; RHAE WISE; BRANDON HARDY; DANIEL BARRINS; DAVID OBROCHTA; KIMBERLY LEAR; and JOHN MIXEN, KEN BRILEY, in his official capacity as the Sheriff of Grundy County, and GRUNDY COUNTY, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stephen Eichelkraut alleges he contracted methicillin-resistant Staphylococcus aureus ("MRSA") during his pretrial detention in the Grundy County Jail. He claims that his infection resulted from jail personnel knowingly housing another inmate with an active, contagious MRSA infection in his living space. Count I of his complaint asserts an Eighth Amendment claim against various individuals employed as correctional officers at the jail (the "Individual Defendants"). Count II asserts a *Monell* claim against Grundy County Sheriff Ken Briley in his official capacity.[1] Defendants filed separate motions to dismiss both counts in Eichelkraut's

---

[1] Grundy County itself is joined as a defendant pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003), as the entity which would be empowered to pay any judgment rendered against a Grundy County employee acting

1

complaint. *See* R. 14, 29. For the reasons set forth below, the Court denies Defendants' motion to dismiss Count I. The Court grants Defendants' motion to dismiss Count II but will permit Eichelkraut an opportunity to amend his complaint.

## Background

Third party R.S. was a detainee at the Grundy County Jail between June and October of 2018. During that time, R.S. raised several complaints related to a preexisting MRSA infection. MRSA is a highly contagious skin infection resistant to certain types of antibiotics. Symptoms include visible skin blemishes, sores, and scabbing. MRSA can be transmitted via person-to-person contact or via shared items. R. 1, ¶¶ 2, 27; *see also* MRSA, General Information, Centers for Disease Control and Prevention (June 26, 2019), *available at* https://www.cdc.gov/mrsa/community/index.html.

R.S. was examined by medical personnel at the jail several times and eventually sent to Morris Hospital, where he was diagnosed with "community acquired MRSA." The discharge instructions noted that MRSA could be spread "by touching item[s], like towels, sheets, bandages, clothes, or sports equipment, that were touched by someone with MRSA." R. 1 ¶ 27. It also said that MRSA infections may be linked to crowded places such as prisons. On discharge, R.S. was transferred to the medical isolation unit of the jail. He was released from jail in October 2018.

---

within the scope of his or her employment. No claims are made against Grundy County directly.

On January 21, 2019, Eichelkraut was arrested for armed robbery. He was booked into Grundy County Jail that day. On February 15, 2019, R.S. was arrested again and booked into Grundy County Jail. That day, Defendant Jungles (a correctional officer who had previously responded to R.S.'s medical complaints during his 2018 detention) conducted a medical screening of R.S. During the screening, R.S. refused to answer certain questions. Jungles wrote a note to "see previous medical conditions." R.S. was placed in the general prison population. On or about April 1, 2019, R.S. was transferred to the cell adjacent to Eichelkraut in Section E.

Over the next month, R.S. complained several times about worsening skin rashes, sores, and similar symptoms. He was examined by medical staff at least four times and prescribed antibiotics but was not ordered into medical isolation. He remained in Section E next to Eichelkraut and continued to use shared facilities, such as bathrooms, gyms, showers, and libraries. On May 3, 2019, a correctional officer discovered that R.S. had been refusing to eat in an effort to force prison officials to respond to his complaints. In response, the treating physician told the officer to remove R.S. from Section E and place him in the medical isolation unit.

On May 6, 2019, while R.S. was in the isolation unit, a nurse at the jail sent a fax to Morris Hospital requesting R.S.'s medical records from 2018. Medical staff collected skin swabs and sent them to the hospital, which returned the results two days later. The culture testing showed R.S. had MRSA which had grown resistant to R.S.'s prior antibiotic treatment. R.S. remained in medical isolation in Section K for at least another week while he continued antibiotic treatments.

At some point, R.S. was transferred out of the medical isolation unit and back to Section E, where he was placed in the same cell as Eichelkraut. However, the other inmates were highly hostile toward R.S., allegedly because of their discomfort with being exposed to his condition, and Defendants elected to return R.S. to isolation in Section K.

In August 2019, Eichelkraut began complaining of skin irritation and was eventually diagnosed with MRSA. He was released from the Grundy County Jail on October 3, 2019 and remains a carrier of MRSA.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d

4

362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Analysis

I. <u>Individual Defendants' Motion to Dismiss Count I</u>

In Count I, Eichelkraut alleges that the Individual Defendants—all correctional officers—consciously disregarded the risk of exposing him to MRSA when they chose to house R.S. in the same jail space as Eichelkraut. The Individual Defendants argue that they cannot be held liable in this case because at all times they were reasonably relying on the independent judgment of medical professionals as to the proper handling of R.S.'s MRSA infection.

The Seventh Circuit has joined other Circuits in limiting liability for non-medical prison personnel when they rely on medical providers to manage an inmate's medical needs. In *Greeno*, the court cited the need for an efficient division of labor between prison personnel as one justification for allowing such reliance:

> If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Under this rule, prison officials will not be found deliberately indifferent if they defer issues of medical treatment to appropriate

5

medical personnel. *See id.*; *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (dismissing claim against grievance examiner who referred plaintiff's medical complaint to prison medical unit).

Were this a claim by R.S. alleging mismanagement of his MRSA infection by prison staff, the Individual Defendants may well be protected by this rule. But R.S. is not the plaintiff here—Eichelkraut is. It is far less obvious that the Individual Defendants were entitled to rely on medical professionals in determining where to house R.S. within the Grundy County Jail. Typically, such inmate placement decisions are entirely up to correctional staff. *See McKine v. Lile*, 536 U.S. 24, 38 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

The Individual Defendants dispute that Eichelkraut's claim is about inmate housing decisions. They insist that Eichelkraut's claim boils down to an accusation that they failed to take adequate steps to prevent the spread of an infection, a matter properly within the expertise of the medical staff. They argue that correctional staff repeatedly sent R.S. for medical evaluations related to his MRSA infection and that each time the medical staff called for him to be isolated, he was. Thus, the Individual Defendants' decisions to place R.S. in the general population at all *other* times simply reflected the fact that medical staff had not instructed them to place him in isolation.

There are two significant and related problems with the Individual Defendants' argument. First, other cases suggest that correctional officers are not necessarily absolved of potential liability from inmate housing decisions simply

6

because they implicate a medical issue. In *Helling v. McKinney*, 509 U.S. 25, 35 (1993), the Supreme Court held that a prisoner had stated a cause of action under the Eighth Amendment by alleging that prison officials were deliberately indifferent to his serious medical needs by assigning him to a cell with another inmate who was a heavy smoker. It also cited with approval a Fifth Circuit case that allowed an Eighth Amendment claim to proceed based on "mingling of inmates with serious contagious diseases with other prison inmates." *Id.* at 34 (citing *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974)). Numerous other courts, including the Seventh Circuit, have similarly held that prison officials may violate the Constitution by knowingly exposing a prisoner to contagious diseases. *See, e.g.*, *Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007); *Spivey v. Doria*, 1994 WL 97756, at *7 (N.D. Ill. Mar. 24, 1994) (denying motion to dismiss detainee's Eighth Amendment claim that jail officials unreasonably exposed him to tuberculosis by housing other contagious inmates among the general population); *Joy v. Healthcare C.M.S.*, 534 F. Supp. 2d 482, 485 (D. Del. 2008) (allowing Eighth Amendment claim alleging exposure to tuberculosis from other contagious inmates to proceed against prison warden); *Maney v. Brown*, 516 F. Supp. 3d 1161, 1179 (D. Or. 2021) ("Courts have also long recognized that prison officials have an Eighth Amendment duty to protect inmates from exposure to communicable diseases."). These cases demonstrate that, at least when it comes to managing the transmission of infectious disease, prison administrators retain some level of responsibility.

Second, the reasonable reliance argument is not a perfect match for the facts of this case. That rule is typically applied in cases where the plaintiff is the person dealing with a serious medical need. *See, e.g.*, *Greeno*, 414 F.3d at 656 (dismissing claim against correctional staff brought by inmate who suffered from esophageal ulcer); *McEachern v. Civiletti*, 502 F. Supp. 532 (N.D. Ill. 1980) (dismissing Eighth Amendment claim against prison administrators brought by prisoner who complained of inadequate medical care for multiple conditions). Here, by contrast, the complaining party (Eichelkraut) was not the person who received direct medical attention, and the complaint does not suggest that the Individual Defendants ever inquired with medical staff about the exposure risk for other inmates housed with or near R.S. The Individual Defendants need not conduct themselves as expert epidemiologists, but precedent indicates they bear some responsibility to control the spread of infectious disease without the direction of medical staff.

Furthermore, the Individual Defendants are advancing a "negative" formulation of this rule, arguing they cannot be held liable for failing to quarantine R.S. because nobody told them to do so. This case strains such a rule. True, correctional staff could likely avoid liability in a scenario where medical staff prescribed one medication for a prisoner's condition and that prisoner later complained correctional staff had not provided him with a different medication. *See Burks*, 555 F.3d at 596 ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference."). But while that scenario could likewise be framed as correctional staff declining to do something the doctors did not tell them

8

to do, it is factually distinguishable from the instant case. In the medication example, the treatment decision is a direct response to the issue referred to the medical staff. The correctional staff would almost certainly have no obligation to second-guess that decision and would be justified in not providing medicine they were not instructed to provide. Here, however, the treatment recommendations the Individual Defendants purport to rely on were not a direct response to Eichelkraut's exposure risk, but to R.S.'s own complaints of illness. Correctional officers cannot ignore an obvious medical issue simply because no doctor has yet prescribed a treatment (nor in the "unusual case where it would be evidence to a layperson that a prisoner is receiving inadequate or inappropriate treatment"). *Donelson v. Prado*, 2011 WL 941233, at *3 (N.D. Ill. Mar. 16, 2011) (quoting *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002)). Here, Eichelkraut has pled that the exposure risk was obvious given R.S.'s visible symptoms and complaints, plus the Individual Defendants' existing knowledge of his contagiousness. Thus, at least in this context, there is a meaningful difference between relying on a doctor's explicit treatment instructions versus the mere fact that a particular instruction wasn't given.

At trial, Eichelkraut would of course bear the burden of proving the Individual Defendants were deliberately indifferent to his predicament. But for now, it is enough to say that carrying out the doctors' orders as to R.S. did not necessarily clear the Individual Defendants of responsibility for Eichelkraut's claim. Eichelkraut's allegations support a reasonable inference that R.S.'s medical examinations were primarily focused on treating *R.S.'s* condition, and less focused on any exposure risk

he may have presented to other inmates. Indeed, Eichelkraut alleges that the medical staff only ordered R.S. to be moved to isolation when they became aware of his hunger strike, and that the transfer was primarily for the purpose of monitoring his eating. If the allegations cut two ways—either the medical staff did not believe R.S. needed to be quarantined, or they simply weren't thinking about it—the motion to dismiss standard requires this Court to extend reasonable inferences in Eichelkraut's favor. Accordingly, at this time the Court cannot say as a matter of law that the Individual Defendants are shielded from Eighth Amendment liability based on their deference to jail medical staff in managing R.S.'s MRSA. Eichelkraut has sufficiently pled that the Individual Defendants knew of R.S.'s condition and that it posed a sufficiently serious health risk to him that the Individual Defendants should have taken action to protect him.

II.     Sheriff Briley's Motion to Dismiss Count II

Sheriff Briley, sued in his official capacity in Count II, moves to dismiss the *Monell* claim on the grounds that Eichelkraut has not alleged an underlying constitutional violation or sufficiently pled a basis for municipal liability. As addressed above, Eichelkraut has sufficiently pled an Eighth Amendment violation, so the first ground may be rejected. Eichelkraut further alleges that his injuries were caused by Briley's "failure to adequately train correctional officers working at the Grundy County Jail and his failure to implement adequate policies regarding the isolation of detainees with communicable illnesses." R. 1 ¶ 90.

"A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and

promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). To demonstrate liability, a plaintiff must show that the county defendant was "deliberately indifferent as to [the] known or obvious consequences" of the policy or custom. *Id.* (alteration in original) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, [a municipality's] failure to make a policy is also actionable." *Id.*

Eichelkraut's allegations fit best into the second category of widespread custom or practice. The Seventh Circuit has not adopted any bright line rules defining a "widespread custom or practice." *Klinger v. City of Chicago*, 2017 WL 736895, at *16 (N.D. Ill. Feb. 24, 2017). "The general principle, however, is that 'the plaintiff must demonstrate that there is a policy at issue rather than a random event.'" *Id.* (quoting *Thomas*, 604 F.3d at 303). Generally, this will require proof that the alleged violations have repeatedly occurred. *Thomas*, 604 F.3d at 303. While it is "not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience," doing so is "necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789-90 (7th Cir. 2006)). "For this reason, courts in this

11

district generally dismiss *Monell* claims in which 'all of the allegations in the Complaint pertain exclusively to the plaintiff.'" *Klinger*, 2017 WL 736895, at *16 (quoting *Davis v. Metro. Pier & Exposition Auth.*, 2012 WL 2576456, at *12 (N.D. Ill. July 3, 2012))

Briley argues that Eichelkraut's complaint fails to demonstrate the existence of a widespread pattern of similar violations because it contains no allegations beyond his own personal experience. Eichelkraut offers two responses. First, he suggests this case is one in which the risk of constitutional violations from a failure to train is "so patently obvious" that the plaintiff may demonstrate liability "without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S 51, 63 (2011); *see also City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989).

"In *Canton*, [the Supreme Court] did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997). The example offered in *Canton* was a hypothetical failure by a city to train its police officers on the constitutional use of deadly force. *Canton*, 489 U.S. at 390 & n.10. A single violation could show deliberate indifference in that example because the need for training would be obvious, as there would be "no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force." *Connick*, 563 U.S. at 64. Furthermore, any inadequacy in said training would be highly likely to cause

12

constitutional violations. *Canton*, 489 U.S. at 390. The Court has since emphasized that these circumstances are "rare" and often involve a "high degree of predictability [that] may also support an inference of causation." *Connick*, 563 U.S. at 64; *Bryan Cty.*, 520 U.S. 409-10.

In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc), the court discussed this principle in a different context. There the plaintiff alleged that her son died while in INDOC custody due to the failure of Corizon, INDOC's institutional medical provider, to coordinate his medical care across various INDOC facilities. The district court granted summary judgment for the defendants, and a panel of the Seventh Circuit affirmed, finding plaintiff had not demonstrated that a Corizon policy or custom had caused the constitutional injury. *Glisson v. Ind. Dep't of Corr.*, 813 F.3d 662, 667 (7th Cir. 2016). Specifically, it found that plaintiff had failed to demonstrate a "widespread practice" through evidence of a "series of incidents." *Id.*

The Seventh Circuit granted rehearing en banc and reversed. It cited INDOC's policy requiring facilities to adopt instructions for continuous management of chronic diseases, including across facility lines. *Glisson*, 849 F.3d at 380. Although this policy "specifically mandate[d] a treatment plan for chronic cases," the evidence showed that Corizon did not base Glisson's care on any "written policies, procedures, or protocols." *Id.* The plaintiff argued that this amounted to a deliberate policy "not to require any kind of formal coordination of medical care either within an institution … or across institutions for prisoners who are transferred." *Id.* at 379.

13

The court explained that a lack of evidence of similar incidents was not necessarily fatal to the plaintiff's claim:

> Notably, neither the Supreme Court in Harris, nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples of the constitutional violation in question. The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice not to act is deliberate could also be enough. The critical question under Monell remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?

*Id.* at 381. The court then compared the need for "comprehensive and coordinated care" when managing "complex, chronic illness" to the use-of-force example from *Canton*, concluding that "[a] jury could find that it was just as certain that Corizon providers would be confronted with patients with chronic illnesses, and that the need to establish protocols for the coordinated care of chronic illnesses is obvious." *Id.* at 382. It further stated that Corizon's admitted failure to implement an appropriate, readily available policy was sufficient evidence of deliberate indifference to survive summary judgment. *Id.*

Although it is a close case, Eichelkraut's allegations do not demonstrate a comparable "obvious" need for training or a policy directed toward managing inmates with contagious diseases. Informing the analysis is the background observation that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Eichelkraut's allegations do not permit an inference that a lack of training or policy makes future constitutional violations likely to occur. The mechanisms in place to respond to infectious diseases

14

in the prison system—including basic common sense as to how to handle someone who is obviously contagious—distinguish this case from the untrained officer example in *Canton*. As Eichelkraut notes, correctional officers conduct intake screening that may make them aware of contagious diseases, and medical staff may suggest or direct individuals be moved to isolation. Indeed, when R.S. was sent the hospital during his original term of incarceration, his discharge instructions indicated he was potentially contagious, and correctional staff responded by moving him to isolation. The fact that R.S. was not immediately isolated again after his re-arrest is insufficient, by itself, to demonstrate a "widespread practice" whereby correctional staff may violate inmates' constitutional rights by exposing them to a serious risk of infection.

Alternatively, Eichelkraut asserts that under *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016), he may, at the motion to dismiss stage, rely solely on his own experience to plead a *Monell* claim. In *White*, the plaintiff raised a *Monell* claim against the city alleging a widespread practice of seeking arrest warrants without probable cause based on conclusory criminal complaint forms. 829 F.3d at 841. The district court dismissed the claim because it was "based upon the sole allegation that [Defendant] acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *Id.* at 843. The Seventh Circuit held that dismissal on this ground was error (albeit harmless for a separate reason), crediting White's allegation that the arrest warrant against him was procured via a deficient form that was standard issue for the Chicago Police Department. *Id.* at 844. It held that White had satisfied the Rule 8 pleading standard and "was not required

15

to identify every other *or even one other individual* who had been arrested pursuant to a warrant obtained through the complained-of process." *Id.* at 844 (emphasis added).

Interpretation of *White* has been mixed. Some courts have seized on the quoted language above to hold that allegations limited to the plaintiff's personal experience are sufficient to survive a motion to dismiss. *See, e.g.*, *Zavala v. Damon*, 2018 WL 3438945, at *3 (N.D. Ill. July 17, 2018) (finding that under *White*, "a plaintiff may rely solely on his own experience to state a *Monell* claim rather than having to plead examples of other individuals' experiences"); *Williams v. City of Chicago*, 2017 WL 3169065, at *9 (N.D. Ill. July 26, 2017) (same). But others have rejected this interpretation as overly broad, citing the *White* court's reference to other supporting allegations. *See, e.g.*, *Anderson v. Allen*, 2020 WL 5891406, at *4 (N.D. Ill. Oct. 5, 2020) ("The key pleaded fact in *White* that saved that plaintiff was that that case's officer used a boilerplate arrest warrant form that was standard issue by CPD."); *Lozanovski v. City of Crown Point*, 2017 WL 347451, at *3 (N.D. Ind. Jan. 24, 2017) ("The Plaintiff's reliance on *White* is misplaced. The allegations in *White* included direct evidence that would have raised the right to relief above the speculative level.").

The latter interpretation appears more consistent with the reasoning in *White*. The court did not declare that personal experience alone was sufficient at the motion to dismiss stage in all cases. Rather, it held that White's otherwise conclusory allegation of a widespread practice "[t]ogether with the individual claim against

16

O'Donnell and the standard printed form that does not require specific factual support for an application for an arrest warrant" was enough to satisfy Rule 8(a)(2). *White*, 829 F.3d 837. Similarly, *Jackson v. Marion Cty.*, 66 F.3d 151, 152-53 (7th Cir. 1995), cited in *White*, held that where *direct evidence* of a governmental entity having engaged in improper conduct is available, "then the drawing of an inference from a series of bad acts by subordinate officers is not required." *See also Glisson*, 849 F.3d at 381 (noting that direct evidence, such as "a single memo or decision showing that the choice not to act is deliberate," could obviate the need for evidence of multiple incidents in a *Monell* claim).

Eichelkraut does not offer comparable direct or supporting evidence. He argues that the complaint shows "that eight different Correctional Officers on at least twelve different occasions failed to isolate R.S. from other inmates despite observing his oozing open wounds and having knowledge that he was under treatment for MRSA." R. 27, at 10. But this falls short of alleging policymakers had "actual or constructive notice" that a lack of training and/or policies as to management of contagious prisoners was "causing city employees to violation citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61, 63 n.7 (2011). Disregarding the legal conclusions in Eichelkraut's complaint, the Court is left only with the allegations of his personal experience, which are insufficient to support a *Monell* claim. *See Canton*, 489 U.S. at 392 (reasoning that allowing a *Monell* claim to go forward based solely on the allegation that a city "could have done" something to prevent a constitutional violation would result in *"de facto respondeat superior* liability").

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss Count I [R. 29] is denied and the motion to dismiss Count II [R. 14] is granted. No later than twenty-one (21) days from the entry of this order, Eichelkraut may file a proposed amended complaint. Any proposed amended complaint should be accompanied by a redline copy showing changes from the original complaint, as well as a brief of no more than five (5) pages explaining how the proposed amended complaint cures the deficiencies identified in this opinion.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: January 11, 2022