UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHEN EICHELKRAUT,<br><br>  Plaintiff,<br><br>  v.<br><br>GRUNDY COUNTY CORRECTIONAL OFFICERS KILEY JUNGLES, MICHAEL WEITZEL, RHAE WISE, BRANDON HARDY, DANIEL BARRINS, DAVID OBROCHTA, KIMBERLY LEAR, AND JOHN MIXEN; KEN BRILEY, in his official capacity as Sheriff of Grundy County; AND GRUNDY COUNTY<br><br>  Defendants. | No. 21 C 2528<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Stephen Eichelkraut claims he contracted a methicillin-resistant Staphylococcus aureus ("MRSA") infection during his pretrial detention at the Grundy County Jail as a result of jail personnel knowingly housing another inmate, R.S., with an active, contagious MRSA infection in his living space. Defendant Officers Kiley Jungles, Michael Weitzel, Rhae Wise, Brandon Hardy, Daniel Barrins, David Obrochta, Kimberly Lear, and John Mixen ("Defendants") move for summary judgment. R. 84. For the following reasons, that motion is denied.

**Background**

Third party R.S. was a detainee at the Grundy County Jail between June and October 2018. During his intake and medical screening, R.S. reported to Defendant Barrins that he had been treated for a MRSA infection at another jail. R. 100 ¶ 1;

1

R.100-8. MRSA is a bacteria that is resistant to certain types of antibiotics and most often causes skin infections. *See* MRSA, General Information, Centers for Disease Control and Prevention (May 15, 2024), available at https://www.cdc.gov/mrsa/community/index.html. Symptoms of MRSA infections include swelling, warmth, redness, and pain in infected skin. MRSA typically spreads through contact with infected people or things carrying the bacteria. *Id.*

In July 2018, a culture was taken from R.S., which did not grow out MRSA. R. 90 ¶ 19. The next month, Defendants Barrins, Obrochta, and Hardy logged complaints by R.S. about his "MRSA" being "inflamed," "bug bites," and his need for another culture. R. 100 ¶¶ 2–4. A second culture was taken, which again did not grow out MRSA. R. 90 ¶ 20. R.S. was also examined by jail physician, Dr. Alma Martija, on August 22, 2018, who recorded R.S.'s subjective complaint of MRSA but observed "normal skin flora." *Id.* ¶ 21; R. 86-12. Sometime in August, R.S. was sent to Morris Hospital. On August 29, 2018, Dr. Maxime Gillis issued a Prisoner Medical Clearance Report, which stated, "I have examined the prisoner and find him/her acceptable for admission t[o] the jail. I have no specific suggestions regarding care of this prisoner for the condition for which I have examined him/her." R. 90 ¶ 22. Separately, discharge instructions indicate R.S.'s diagnosis with "Community Acquired MRSA." R. 100 ¶ 5; R. 93-14. R.S. was released from the jail at some point thereafter.

On January 21, 2019, Eichelkraut was arrested and booked into the Grundy County Jail. R. 90 ¶ 4. A few weeks later, on February 15, 2019, R.S. was again booked into the jail. R. 100 ¶ 22. During his intake, R.S. refused to answer medical screening

questions, so Defendant Jungles requested that his "past visit" be shared with the jail's nurse. *Id.*; R. 93-11. From March 14, 2019 until May 3, 2019 and from May 16, 2019 to May 31, 2019, Eichelkraut and R.S. were housed in "E Pod" together. R. 90 ¶¶ 6, 12, 42; R. 100 ¶ 10. The pod consisted of four cells and a day room area with a TV, table, and a communal shower. R. 100 ¶ 11. R.S. and Eichelkraut never shared a cell. R. 90 ¶ 6.

Between February and June 2019, R.S. lodged more than 25 requests for medical care with Defendants, ranging from MRSA-associated symptoms like rashes, sores, and folliculitis to other symptoms like high blood pressure, headache, dizziness, tooth pain, and an injured toe. *Id.* ¶¶ 24–49. The requests that specifically referenced MRSA or his sores began on April 1, 2019:

- April 1, 2019: Defendant Jungles logged R.S.'s complaint that "MRSA/Fakiculitice [folliculitis] is back and worse each day."

- April 10, 2019: Defendant Barrins logged R.S.'s "request to speak with you about his antibiotics/still has sores."

- April 22, 2019: Defendant Lear logged R.S.'s complaint that he "need[s] antibiotics to get rid of falculiitics [folliculitis] – its getting worse and isn't healing."

- April 24, 2019: Defendant Jungles logged R.S.'s complaint that "sores on head and face [are] getting worse."

- April 25, 2019: Defendant Weitzel logged R.S.'s complaint that "infections are getting worse[,] hair and mustache falling out[,] need antibiotics."

- April 26, 2019: Defendant Hardy logged R.S.'s complaint that his "infection [was] getting worse."

R. 100 ¶¶ R. 93-12. Each time that R.S. complained, Defendants referred him to medical staff. R. 90 ¶ 54. During the visits, medical staff observed sores and related

3

marks on R.S.'s skin. *Id.* ¶ 30 (March 25: "rash like marks on his head"); *id.* ¶ 33 (April 3: "rash on head + face"); *id.* ¶ 34 (April 10: "painful, red, sore on back, scabbed over); *id.* ¶ 35 (April 22: "h[istory] MRSA; folliculitis: 2 open sores on top of head, L ear area"); *id.* ¶ 36 (April 24: "sores appear worse than 2 days ago[;] new sores on face"); *id.* ¶ 37 (April 26: "new sores have appeared on [right] side of face + [left] jawline[,] sores on head appear to be progressively worse"); *see also* R. 86-14.

On April 29, 2019, Defendant Obrochta logged R.S.'s complaint of "sores on face, head, & body – wants antibiotics." R. 100 ¶ 28. R.S. was examined by Dr. Martija, who reported "random open sores which are not draining and could result from anxious picking" and which were "not typical of MRSA." R. 90 ¶ 38; R. 86-14. She further wrote that she "doubt[ed] MRSA but we can culture if equipment available." R. 90 ¶ 38; R. 86-14. The next day, a culture was obtained from sores on R.S.'s forehead and upper lip. R. 90 ¶ 39. On May 1, 2019, Wise logged a new complaint from R.S. that he "need[s] to talk to nurse about sores." R. 100 ¶ 29. The nurse observed that the sores were "slightly better" and advised R.S. that the culture results would take 5-7 days. R. 90 ¶ 41.

Two days later, on May 3, 2019, R.S. started a hunger strike and was placed in an isolated medical unit for observation until May 16, 2019. *Id.* ¶ 42. Defendant Obrochta logged R.S.'s complaint on May 5, 2019 that "nothing [is] being done about medical issues." R. 100 ¶ 30. On May 8th, lab results revealed that R.S.'s culture did not grow MRSA, but grew out a different bacteria, methicillin-susceptible Staphylococcus aureus ("MSSA"). R. 90 ¶¶ 40, 44. According to Eichelkraut's expert,

4

standard cultures frequently fail to detect MRSA, particularly when it is present with MSSA. R. 100 ¶ 73. No further cultures were taken after the April 30, 2019 culture. *Id.* ¶¶ 49–50.

R.S.'s complaints resumed shortly thereafter. On May 15, 2019, Defendant Barrins logged R.S.'s complaint that "the sores on my head are not healed yet. I need more antibiotics." *Id.* ¶ 31. Two days later, medical staff examined R.S. and observed that the "sores are healing or all healed," and three days after that observed that the "sores on face and head [a]ll appear to be healing." R. 90 ¶¶ 45–46. On May 25, 2019, Defendant Hardy logged R.S.'s complaint of "sores on head," R. 100 ¶ 32, and on May 29, 2019, Defendant Wise logged R.S.'s complaint that his "MRSA [is] getting worse," *id.* ¶ 33. R.S. also filed a grievance on May 29th, stating, in part, "You tested me. You know I have MRSA and it is spreading. [T]he sores are bleeding and leaking puss[.] I have more sores that I had before[.] [A]ll I want is treatment[.] It is very contagous [sic] and I am leaking fluids all over this jail. I am in your care and by law you have to keep me medicaly [sic] treated and you are not[.] . . ." *Id.* ¶ 52; R. 93-17. That day, Dr. Martija examined R.S and observed two sores on R.S.'s scalp, which she described as "flat" and "not inflamed" with "no fluid discharge." R. 90 ¶ 47.

Eichelkraut became aware of reports that R.S. had MRSA in April 2019. *Id.* ¶ 7. Around that time, Eichelkraut observed sores on R.S.'s face and back. R. 100 ¶¶ 14, 17. Over the course of the next month, Eichelkraut and other inmates told Defendants about R.S.'s open wounds and complained about R.S. being in the same pod with them, but Eichelkraut himself did not file a grievance. R. 90 ¶ 11; R. 100 ¶¶

5

20, 21. An incident report from May 31, 2019 states that Defendant Mixen told Defendant Jungles that the inmates in Section E "were extremely concerned that [R.S.] 'gave us all MRSA' and there was an extreme amount of hostility amongst the inmates toward [R.S.]". R. 100 ¶ 34; R. 92-16. That day, Defendant Jungles logged R.S.'s complaint of a "skin breakout – chin, scalp/other," noting that "inmates and [R.S.] [are] concerned (MRSA)." R. 100 ¶ 34; R. 92-16. Defendants Jungles, Mixen, and another officer decided to isolate R.S. until he could visit medical staff. R. 100 ¶ 34; R. 92-16. May 31, 2019 was the last day that R.S. and Eichelkraut were housed in the same pod. R. 90 ¶ 12.

Each time that Defendants logged a complaint by R.S., they could see his previous medical requests. R. 100 ¶ 35. Though Defendants denied or did not recall seeing obvious signs of infection on R.S., R. 90 ¶ 53, most recalled observing marks on R.S.'s skin. R. 100 ¶ 23 (Mixen observing "scabs and/or pimples that were picked at"); *id.* ¶ 24 (Defendant Barrins observing "imperfections" and that "R.S. was particularly dirty and did have a fun habit of squeezing zits on the dayroom table and then rubbing the pus all over it."); *id.* ¶ 26 (Defendant Weitzel observing sores that looked like acne); *id.* ¶ 27 (Defendant Hardy observing "imperfections" that appeared to "pimple[s] or razor injuries" and "ingrown hair"); *id.* ¶ 28 (Defendant Obrochta observing "scabbish sore" on R.S.'s head that looked like a "big scratch" with "no oozing"); *id.* ¶ 34 (Defendant Jungles observing "open sores" on R.S.'s chin).

Defendants, as correctional officers at Grundy County Jail, had the ability to move inmates into isolation if an inmate had or was suspected of having an infection

6

like MRSA. *Id.* ¶¶ 44–45. More specifically, Grundy County Sheriff's Office Policy 730 on Communicable Diseases provides, "Inmates suspected of having communicable diseases will be appropriately isolated until disease confirmation and the period of communicability is determined." *Id.* ¶ 41. Similarly, Grundy County Sheriff's Office Policy 504 on Inmate Reception states, "if the arrestee is suspected of having any type of communicable disease the arrestee shall be isolated and referred immediately to the Responsible Physician." *Id.* ¶ 43. Moreover, pursuant to Grundy County Jail's policy on "Dermatology Skin Infections – Boils," correctional officers are to assume that a boil is MRSA. *Id.* ¶ 46.

In early August 2019, Eichelkraut began to experience severe leg pain and small spider-like bites. R. 90 ¶¶ 13, 14, 50, 51. He was ultimately transported to the hospital, where a culture was taken and he was diagnosed with MRSA on August 19, 2019. *Id.* ¶ 14. Following this diagnosis, Eichelkraut was placed in isolation for one-to-two weeks until his sores cleared up. *Id.* ¶ 15. He has not been treated for MRSA since he left the jail. *Id.* ¶ 17.

Defendants' expert, Dr. Robert Citronberg, opines that R.S. could not have infected Eichelkraut because R.S.'s cultures indicate that he had MSSA, not MRSA. *Id.* ¶ 51. He adds that the MRSA diagnosis on the discharge instructions was based solely on R.S.'s subjective complaints. R. 100 ¶ 68. Eichelkraut's expert, Dr. David Ross, opines that it is more likely than not that R.S. had a MRSA infection and was

7

the source of Eichelkraut's MRSA infection. R. 100 ¶ 72. In his view, the negative culture results do not rule out that R.S. had MRSA. *Id.* ¶ 73.[1]

On May 11, 2021, Eichelkraut filed this suit asserting that he contracted MRSA because Defendants failed to isolate R.S. The Court dismissed the *Monell* claim and allowed Eichelkraut's claim against Defendants to proceed. Defendants now move for summary judgment.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948

---

[1] Eichelkraut submitted Dr. Ross's report as an exhibit to his response to Defendants' motion. *See* R. 93-10. Defendants ask the Court to strike that report as inadmissible hearsay. Defendants also submitted the report of their expert, Dr. Citronberg, as an exhibit in support of their motion. *See* R. 86-18. A party who wants to rely on an expert report at the summary judgment stage must come forward with an affidavit or declaration from the expert in which the expert confirms that he or she would testify consistent with the report at trial. *Allen v. Benton*, No. 18-CV-4047, 2022 WL 18147674, at *4 (N.D. Ill. Feb. 25, 2022). Because neither party has supplied such an affidavit or declaration here, the Court declines to consider the reports and relies instead on the testimony from the experts' depositions.

8

(7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

Because Eichelkraut was a pretrial detainee, his conditions-of-confinement claim arises under the Fourteenth Amendment.[2] While an Eighth Amendment conditions-of-confinement claim "requires a showing of both an objectively unreasonable deprivation of rights and subjective deliberate indifference," a Fourteenth Amendment claim only requires the former. *Kemp v. Fulton Cnty.*, 27 F.4th 491, 495 (7th Cir. 2022) (explaining how the different standards stem from the fact that "pretrial detainees are entitled to the presumption of innocence, and so the Constitution protects them from any punishment for the acts that led to their detention"); *see also Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

Accordingly, a plaintiff such as Eichelkraut challenging the conditions of pretrial detention only needs to show that a defendant's conduct was "objectively

---

[2] Defendants urge the Court to apply the Eighth Amendment standard because Eichelkraut's complaint only references the Eighth Amendment. But "[c]omplaints plead *grievances*, not legal theories." *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) (emphasis in original). Defendants acknowledge that the Fourteenth Amendment is the proper standard for pretrial detainees' conditions-of-confinement claims. R. 87 at 7. That is the standard the Court will apply.

unreasonable." *Kemp*, 27 F.4th at 495. Defendants are liable if they "acted purposefully, knowingly, or perhaps even recklessly" in not isolating R.S., but not if they were no more than negligent. *Id.* Objective reasonableness turns on the facts and circumstances of each case. *Id.*

In essence, Eichelkraut claims Defendants failed to protect him from the serious health risk posed by R.S. The elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are as follows:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)). Though neither party cites *Kemp* or the aforementioned elements, the Court finds it helpful to analyze the parties' arguments with this framework in mind.

I. Whether R.S. Had MRSA

Defendants first argue that summary judgment is appropriate because Eichelkraut cannot show that R.S. had a MRSA infection in 2019. If R.S. did not actually have MRSA, then failing to isolate him did not put Eichelkraut at substantial risk of suffering serious harm or cause his injuries.

On this question, the evidence points in both directions. On the one hand, none of R.S.'s cultures grew MRSA and certain of the cultures contained MSSA, a different bacteria. On the other hand, R.S. repeatedly complained about sores that he called MRSA in April and May 2019; medical staff, Eichelkraut, and most of the Defendants observed sores or skin imperfections during that period; and the sores R.S. complained about in May 2019 were never cultured. Further, the August 29, 2018 discharge instructions indicate that R.S. had been diagnosed with "Community Acquired MRSA." Defendants urge that this "unverified" diagnosis runs counter to the negative culture from August 13, 2018, the fact that Dr. Martija did not diagnose R.S. with MRSA during the August 22, 2018 examination, and the August 29, 2018 Prison Medical Clearance Report that did not indicate MRSA and made "no specific suggestions" regarding the care for his complained-of condition. R. 87 at 10. But accepting Defendants' position would require the Court to weigh conflicting evidence, which it simply cannot do. *Stewart*, 14 F.4th at 760.

Additionally, the parties' experts offer opposing views on the question. While Dr. Citronberg, Defendants' expert, opines that Eichelkraut did not contract MRSA from R.S., Dr. Ross, Eichelkraut's expert, opines that it is more likely than not that he did. Resolution of this "classic battle of the experts" is for the jury. *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009); *see also Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) (explaining that "in a case of dueling experts . . . it is left to the trier of fact . . . to decide how to weigh the competing expert testimony"). Defendants point out that Dr. Ross admitted that cultures are 95% accurate, and that

11

he never viewed photos of R.S.'s lesions. It may be that a jury finds that Dr. Ross's opinion is not credible or should be given less weight for those reasons. But the Court cannot reach such a conclusion on a motion for summary judgment. *Stewart*, 14 F.4th at 760. Thus, there is a genuine dispute of material fact about whether R.S. had MRSA and transmitted it to Eichelkraut.

II. Whether Defendants Were On Notice that R.S. Had MRSA

Defendants next contend that Eichelkraut cannot show they knew that R.S. had an active MRSA infection and thus posed a serious risk to Eichelkraut. The first problem with this argument is that Defendants apply the wrong standard. Defendants repeatedly cite the deliberate indifference standard for Eighth Amendment claims. Under that standard, an official must be subjectively aware of the risk of harm to an inmate. That is, he must "both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). But, as the Court previously explained, pretrial detainees like Eichelkraut do not have to prove the officer's subjective (i.e., actual) awareness of a substantial risk. *Kemp*, 27 F.4th at 497; *see also id.* at 496 ("[A] pretrial detainee does not need to show that an officer with all the information about a potential health or safety risk actually did put the puzzle pieces together."). Instead, he must show that reasonable officers in Defendants' shoes would have appreciated the risk that their actions entailed. *Id.*

Here, Eichelkraut outlines the ways in which Defendants were on notice that R.S. posed a serious risk of harm to him. Defendants received and logged numerous

12

complaints by R.S. about his sores, many of which explicitly referenced MRSA. Additionally, Defendants observed sores and other imperfections on R.S.'s skin and received complaints from Eichelkraut and other inmates about R.S.'s wounds and having to be in the pod with him. Viewed in the light most favorable to Eichelkraut, the number of complaints, the specific references to MRSA in those complaints, and the observation of marks on R.S.'s skin put Defendants on notice that R.S. had an active MRSA infection. *Cf. Kemp*, 27 F.4th at 497 (no evidence that correctional officer was on notice of serious risk to pretrial detainee who was beaten by inmates in the same cell block where there were no reports of the verbal disagreement that preceded the beating to officers and the inmates had lived together peacefully for months).

It is true that Defendants testified that the marks on R.S.'s skin looked like scabs, zits, pimples, acne, scratches, razor burn, and ingrown hairs, not signs of an infection like MRSA. That stands in contrast to Eichelkraut's descriptions of R.S.'s sores, which he described as open wounds, as well as R.S.'s own descriptions of his sores to Defendants and medical staff. It may be that the jury finds Defendants' testimony credible, and concludes that reasonable officers in the same circumstances would not have appreciated the risk that R.S. had MRSA. Or the jury could find the testimony is not credible in light of other evidence regarding R.S.'s appearance and repeated complaints, and conclude that reasonable officers would have appreciated the risk. That assessment is for the jury.

Defendants also emphasize that in the course of the numerous referrals, they never received any reports from medical staff that R.S. in fact had MRSA. But the

13

fact that Defendants did not receive confirmation from medical staff of a diagnosis does not mean they were oblivious to R.S.'s medical condition. Instead, they each heard R.S. and others repeatedly complain about R.S.'s sores, often with explicit reference to MRSA, and most of them recalled observing lesions on R.S.'s body. This evidence creates a triable issue as to whether reasonable officers in Defendants' position would have appreciated the risk of R.S. having MRSA and transmitting it to others in his pod.

   III.   Whether Defendants' Decision Not to Isolate R.S. Was Objectively Unreasonable

Lastly, Defendants argue that Eichelkraut cannot show they acted in an objectively unreasonable manner in not isolating R.S. They reiterate that they logged each of R.S.'s complaints, took him to medical staff, and never received any indication from medical staff that he should be isolated from other inmates. But the jail's policies required officers to isolate inmates who are suspected of having a communicable disease until the disease is confirmed and the period of communicability is determined. It is undisputed that Defendants did not isolate R.S. until May 31, 2019. A jury could conclude that Defendants' inaction before that time, in the face of policies instructing otherwise, was objectively unreasonable.

Defendants argue that they did not suspect that R.S. had MRSA, so the policies did not apply. A jury might believe Defendants' testimony on this point, or it might not in light of the evidence discussed in the previous section. Because a reasonable jury could find that Defendants at least suspected that R.S. had MRSA, such that the

policies would apply, there is a triable issue on whether their failure to isolate R.S. was objectively unreasonable.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: May 17, 2024